

**SO ORDERED.**

**SIGNED this 31 day of July, 2006.**

**A. Thomas Small**
**United States Bankruptcy Judge**

---

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
FAYETTEVILLE DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| NATIONAL GAS DISTRIBUTORS, LLC | 06-00166-8-ATS |
|     DEBTOR | |
| | |
| RICHARD M. HUTSON, II, TRUSTEE | ADVERSARY PROCEEDING NO. |
|     Plaintiff | S-06-00029-8-AP |
|     v. | |
| BRANCH BANKING & TRUST COMPANY | |
|     Defendant. | |

BRANCH BANKING & TRUST COMPANY

    Third-Party Plaintiff

    v.

PAUL D. LAWING, JR. and
ANN H. LAWING

    Third-Party Defendants.

ORDER ALLOWING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The matter before the court is the motion for summary judgment filed by the plaintiff, Richard M. Hutson II, trustee for the chapter 11 debtor National Gas Distributors, LLC ("NGD"). The trustee seeks to avoid and to recover, pursuant to 11 U.S.C. §§ 547 and 550, preferential transfers aggregating $3,263,516.15 made by NGD to the defendant, Branch Banking and Trust Company ("BB&T").[1] BB&T's defense under § 547(c)(2)(B) is that the transfers, two loan payments in the amounts of $755,329.80 and $2,508,186.35, are not avoidable because they were "made according to ordinary business terms."[2] It is not disputed that the two loan payments meet the requirements of § 547(b) and may be avoided unless BB&T prevails on its "ordinary business terms" defense under § 547(c)(2)(B).

The phrase "ordinary business terms" has been analyzed and interpreted many times by many courts in connection with, and as a part of, what has been known as the "ordinary course of business" defense under § 547(c)(2). Section 547(c)(2), however, was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, § 409. That section now

---

[1]The complaint also seeks to avoid two transfers of funds to secure a letter of credit issued by BB&T and to recover funds from BB&T from NGD's bank accounts. Fortunately, those issues have been resolved and will be the subject of a separate order.

[2]In its answer, NGD did raise the defense under § 547(c)(2)(A) that the transfers were "made in the ordinary course of business," but that defense has not been pursued.

2

includes both an "ordinary course of business" defense under § 547(c)(2)(A) and a separate, independent "ordinary business terms" defense under § 547(c)(2)(B).

Prior to BAPCPA, these two defenses were dual components of a single defense. Now the phrase "ordinary business terms" included in § 547(c)(2)(B), is no longer part of the "ordinary course of business" defense in § 547(c)(2)(A). So, although the words "ordinary business terms" were not changed by BAPCPA, the context in which they appear in § 547(c)(2) has substantially changed. Whether the words "ordinary business terms" acquired new meaning in their new context, and what that meaning might be, are the primary issues before the court.

A hearing was held in Raleigh, North Carolina, on June 28, 2006. This bankruptcy court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. §§ 157(b)(2)(F), which this court may hear and determine.

National Gas Distributors, LLC was a purchaser and distributor of natural gas, propane and other energy commodities, and in January 2006 it became subject to a North Carolina state court receivership. NGD filed a petition for relief under chapter 11 of the Bankruptcy Code on

3

January 20, 2006.  On January 24, at the request of the state court receiver and without objection from the debtor, Mr. Hutson was appointed chapter 11 trustee.

NGD, which is owned by Paul Lawing, had several ongoing credit transactions with BB&T including a line of credit, a working capital loan, and letters of credit.  None of NGD's obligations to BB&T were secured by NGD's assets, but all of the obligations were subject to the guaranties of Mr. Lawing and his wife, Ann Lawing, and all of the obligations were secured by assets owned by Mrs. Lawing.[3]  Two credit facilities were paid with transfers that are the subjects of this proceeding: the revolving line of credit, and the working capital loan.

The line of credit was evidenced by a promissory note dated March 31, 2003, in the principal amount of $1,000,000.  The line of credit obligation was to mature on November 5, 2003, but the maturity was extended to November 5, 2004, and later extended to November 8, 2005, and then to December 23, 2005.  On December 15, 2005, NGD transferred $755,329.80 to BB&T to pay the balance outstanding under the line of credit note.

The working capital loan was evidenced by a promissory note dated September 27, 2004, in the principal amount of $2,500,000.  The working capital note was to mature on March 27, 2005, but the maturity was

---

[3]The assets owned by Mrs. Lawing were subject to a management agreement between Mrs. Lawing and BB&T (Managing Agency Agreement originally numbered 50281200 and later renumbered 1152002505).

extended to August 5, 2005, and later extended to October 16, 2005, and then to December 23, 2005.  On December 19, 2005, NGD transferred $2,508,186.35 to BB&T to pay the balance outstanding under the working capital note.

On December 20, 2005, about the same time that NGD was paying the line of credit and the working capital loan, NGD transferred $850,000 to BB&T to collateralize NGD's obligations with respect to two letters of credit in the amounts of $600,000 and $250,000.  As a result of that transfer, BB&T released property owned by Mrs. Lawing that BB&T held as collateral to secure NGD's liability regarding the letters of credit.  The trustee does not seek to recover the $850,000 transfer, but the transfer is relevant to the course of dealing between NGD and BB&T.  The trustee, by letter dated February 10, 2006, made demand upon BB&T to repay the transfers.  Trustee Affidavit at ¶ 10.

For a transfer to be avoidable, it must satisfy the requirements of § 547(b).  Section 547(b) provides as follows:

> Except as provided in subsection (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made--
>     (A) on or within 90 days before the date of the filing of the petition; or
>     (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

> (5) that enables such creditor to receive more than such
> creditor would receive if--
>> (A) the case were a case under chapter 7 of this title;
>> (B) the transfer had not been made; and
>> (C) such creditor received payment of such debt to the
>> extent provided by the provisions of this title.

11 U.S.C. § 547(b) (2005).

It is not disputed that the payments of $755,329.80 and $2,508,186.35 were transfers of the debtor's property made to or for the benefit of BB&T on account of antecedent debts, while NGD was insolvent, and within ninety days of date of NGD's bankruptcy petition. It is also not disputed that the payments enabled BB&T to receive more that BB&T would have received had the payments not been made and NGD was a debtor in a case under chapter 7. The trustee has met his burden of establishing the elements of § 547(b), and may avoid the two payments unless BB&T can establish its defense under § 547(c)(2)(B).

11 U.S.C. § 547(c)(2) as amended by BAPCPA provides as follows:

> (c) The trustee may not avoid under this section a transfer--
> (1) . . .
> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--
>> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>> (B) made according to ordinary business terms.

The trustee concedes that the transfers were in payment of debts that were incurred by NGD in the ordinary course of business of NGD and BB&T, but disagrees that the payments were made according to

"ordinary business terms."  BB&T has the burden of proving all of the elements of its defense, <u>Advo-System, Inc. v. Maxway Corp.</u>, 37 F.3d 1044, 1047 (4th Cir. 1994), and in support of its defense that the payments were made according to ordinary business terms, it submitted the affidavit of BB&T Vice President Stephen G. Smith.

Mr. Smith, the BB&T loan officer who handled the NGD transactions, stated that BB&T as a matter of routine practice extended the maturity dates of the line of credit note and the working capital note and would have extended the maturity date of December 23, 2005, for each of the notes if requested by NGD.  Smith Affidavit ¶ 12.  At the time the notes were paid, BB&T and NGD were discussing a $20,000,000 revolving line of credit that would have paid the BB&T notes as well those with another lender.  Smith Affidavit ¶ 8.  Mr. Smith states that neither note was ever in default, and BB&T had no knowledge of NGD's financial difficulties.  Smith Affidavit ¶ 12.  BB&T "did not demand, request, or in any way suggest that the Line of Credit Note or the Working Capital Note be paid," Smith Affidavit ¶ 12, and "BB&T made no attempts to collect" on the notes.  Smith Affidavit ¶ 15.  According to Mr. Smith, he was told by Mr. Lawing that the notes were paid in full as "part of Mr. and Mrs. Lawing's end-of-the-year estate planning."  Smith Affidavit ¶ 9.

Mr. Smith, who has been employed with BB&T for approximately 15 years and has been working in the banking industry for approximately 30

7

years, states that he is "familiar with the standard and ordinary terms
used at BB&T and in the banking industry in general for commercial
loans, including line of credit loans and working capital loans." Smith
Affidavit ¶ 1.  The following statements from Mr. Smith's affidavit are
in the nature of Mr. Smith's expert opinion regarding "ordinary
business terms":

- ! "The terms of the Line of Credit Note and the Working
  Capital Note are typical of those normally extended to
  similar businesses that borrow money from BB&T.  The terms
  of the Line of Credit Note and the Working Capital Note are
  typical of those normally extended to similar businesses in
  the banking industry."  Smith Affidavit ¶ 6.
- ! "It is a customary practice within BB&T and in the banking
  industry for a lender to execute modification agreements
  extending maturity dates of promissory notes for borrowers.
  The Line of Credit Note and the Working Capital Note and the
  modifications to these notes were done on standard BB&T
  documents and contain terms that are standard and ordinary
  at BB&T and in the banking industry." Smith Affidavit ¶ 7.
- ! "When a promissory note becomes due, it is typical and
  customary at BB&T and in the banking industry for a borrower
  to pay the note in full on the maturity date or within
  several weeks before the maturity date." Smith Affidavit ¶
  13.
- ! "The payment of the Line of Credit Note on December 15, 2005
  and the Working Capital Note on December 18, 2005 were made
  within the terms of the Notes, as modified.  These payments
  were well within the standard terms and practice at BB&T, as
  well as a standard practice in the banking industry in
  general."  Smith Affidavit ¶ 14.

These four statements capture the heart of BB&T's evidence in support
of its defense.

The trustee submitted an affidavit in support of his motion for
summary judgment that supports the requirements of § 547(b), but the
affidavit does not address BB&T's "ordinary business terms" defense.

8

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). In making this determination, conflicts are resolved by viewing all facts and inferences to be drawn from the facts in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 82 S. Ct. 993 (1962). Summary judgment should not be granted unless the moving party establishes his right to judgment "with such clarity as to leave no room for controversy." Portis v. Folk Constr. Co., 694 F.2d 520, 522 (8th Cir. 1982).

The trustee's entitlement to summary judgment depends on whether BB&T has set forth sufficient evidence to establish its "ordinary business terms" defense. In making that determination, the court must first ascertain the meaning of "ordinary business terms." As already mentioned "ordinary business terms" has been interpreted by many courts as a part of the "ordinary course of business" defense under § 547(c)(2). However, that section was amended and reconfigured by BAPCPA. The change was accomplished "by the simple expedient of changing

an 'and' to an 'or,' but the defense "changed dramatically." Charles J. Tabb, <u>The Brave New World of Bankruptcy Preferences</u>, 13 Am. Bankr. Inst. L. Rev. 425, 428 (2005). Prior case law provides the answers to some of the "ordinary business terms" questions, but after BAPCPA, those answers may no longer be complete.

After the amendments made by BAPCPA, § 547(c)(2) is, in effect, a new statute, and, as with any new statute, its interpretation starts with the statute's plain meaning. <u>United States v. Ron Pair Enters., Inc.</u>, 489 U.S. 235, 243, 109 S. Ct. 1026, 1031 (1989); <u>Lamie v. U.S. Trustee</u>, 540 U.S. 526, 536, 124 S. Ct. 1023, 1031 (2004). Unfortunately, the phrase "ordinary business terms" is so inclusive that a plain meaning analysis is not helpful. Neither is the legislative history to the BAPCPA amendments.

The legislative history regarding BAPCPA § 409 provides as follows:

> [S]ection 547(c)(2) of the Bankruptcy Code [is amended] to provide that a trustee may not avoid a transfer to the extent such transfer was in payment of a debt incurred by the debtor in the ordinary course of the business or financial affairs of the debtor and the transferee and such transfer was made either: (1) in the ordinary course of the debtor's and the transferee's business or financial affairs; or (2) in accordance with ordinary business terms. Present law requires the recipient of a preferential transfer to establish both of these grounds in order to sustain a defense to a preferential transfer proceeding. . . .

10

E-2 <u>Collier on Bankruptcy</u> App. Pt. 10(b) at App. Pt. 10-355 (Alan N. Resnick and Henry J. Sommer, eds., 15th ed. rev. 2005).  The legislative history emphasizes that "or" is to be read in the disjunctive but otherwise imparts no insight into how the reconstructed statute should be interpreted.

Although the BAPCPA legislative history is sparse, the development of the proposal on which the amendments to § 547(c)(2) is based is well documented.  <u>See</u> Tabb, <u>Bankruptcy Preferences</u>, 13 Am. Bankr. Inst. L. Rev. at 440-445.

Prior to the BAPCPA amendments § 547(c)(2) provided:

(c) The trustee may not avoid under this section a transfer-
    (1) . . .
    (2) to the extent such transfer was--
        (A) in payment of a debt incurred by the debtor in the
        ordinary course of business or financial affairs of the
        debtor and the transferee;
        (B) made in the ordinary course of business or
        financial affairs of the debtor and the transferee;
        and
        (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2) (1994).

Creditors were dissatisfied with several aspects of preference law, including the uncertainty of the "ordinary course of business defense," and an American Bankruptcy Institute task force was created in 1995 to examine those concerns.[4]  Tabb, <u>Bankruptcy Preferences</u>,

_____

[4]The Task Force on Preferences was formed in May 1995 by the Unsecured Trade Creditor Committee of the American Bankruptcy Institute, chaired by Joseph S.U. Bodoff of Boston.  The reporter for the task force was Charles J. Tabb, and the report of the task force,

13 Am. Bankr. Inst. L. Rev. at 425.  The task force's report made four recommendations for changes to preference law including a recommendation to "[c]larify the ordinary course of business defense." American Bankruptcy Institute Task Force on Preferences, PREFERENCE SURVEY REPORT (PART OF THE BANKRUPTCY REFORM STUDY PROJECT) (1997); Tabb, Bankruptcy Preferences, 13 Am. Bankr. Inst. L. Rev. at 427. The task force recommended that the ordinary course of business defense could be clarified by more "objectification," and that recommendation was adopted by the National Bankruptcy Review Commission ("NBRC"). Tabb, Bankruptcy Preferences, 13 Am. Bankr. Inst. L. Rev. at 427. The NBRC recommendation was adopted by Congress and included in BAPCPA.

NBRC Recommendation 3.2.3 provided that "11 U.S.C. § 547(c)(2)(B) should be amended to provide a disjunctive test for whether a payment is made in the ordinary course of the debtor's business if it is made according to ordinary business terms." Nat'l Bankr. Rev. Comm'n, BANKRUPTCY: THE NEXT TWENTY YEARS, FINAL REPORT (1997); Tabb, Bankruptcy Preferences, 13 Am. Bankr. Inst. L. Rev. at 427.  The NBRC report explained that

> [t]he Recommendation adopts the view that the conduct between the parties should prevail to the extent that there was sufficient prepetition conduct to establish a course of dealing.  A disjunctive test telescopes the ordinary course inquiry on the course of conduct between the parties.  In the event there is not sufficient prepetition conduct to

---

"Preference Survey Report," was published in May 1997.  Tabb, Bankruptcy Preferences, 13 Am. Bankr. Inst. L. Rev. at 425-426.

12

> establish a course of dealing, then industry standards should supply the ordinary course benchmark. Quite often industry standards are extremely difficult to ascertain outside bankruptcy and difficult to prove in the context of preference litigation. Thus, it is more accurate to rely on the relationship between the parties.

NBRC Report, G Collier on Bankruptcy App. Pt. 44 at App. Pt. 44-798 (Alan N. Resnick and Henry J. Sommer, eds., 15th ed. rev. 2005).

Although the stated intention of the NBRC recommendation adopted by Congress in BAPCPA was to limit the use of the "hard-to-prove objective industry test" to those rare cases where "there was insufficient pre-petition conduct between the parties to establish a course of dealing," the statute clearly does not contain that limitation. Tabb, Bankruptcy Preferences, 13 Am. Bankr. Inst. L. Rev. at 442. "It [the objective industry standard] would appear to be equally available even if the parties do have a course of dealing, yet the transfer at issue does not conform to that course of dealing, but nevertheless still might conform to the industry standard."[5] Tabb, Bankruptcy Preferences, 13 Am. Bankr. Inst. L. Rev. at 442.

---

[5] A recommendation made by Timothy M. Lupinacci in 1996 would have more effectively achieved NBRC's stated intention. Mr. Lupinacci's recommendation was that the statute be modified to provide under section 547(c)(2)(B) that the transfer was "made in [the] ordinary course of business or financial affairs of the debtor and the transferee, or if no such course of affairs exists, such transfer was made according to ordinary business terms." Timothy M. Lupinacci, Analyzing Industry Standards in Defending Preference Actions: Equitable Purpose in Search of Statutory Clarity, 5 J. Bankr. L. & Prac. 129, 168 (1996).

In sum, although the NBRC recommendation, upon which the new statute is based, intended that the objective industry standard of "ordinary business terms" should only be utilized where no course of dealing between the parties has been established, the statute as amended allows the objective "ordinary business terms" defense to be used where a course of dealing existed and even where the transfers at issue clearly deviated from that course of conduct.

While the NBRC Report explains the derivation of the statute, it provides no guidance to the meaning of "ordinary business terms." For that we turn to pre-BAPCPA case law.

To best understand how the statutory language should be interpreted in its new capacity as a separate "stand alone" statutory requirement rather than as a distinct but secondary requirement in a series of others, it is helpful to review the development of the extensive pre-BAPCPA case law interpreting "ordinary business terms."

Section 547(c)(2) of the Bankruptcy Code was enacted as part of the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1978). "During the first decade of the Bankruptcy Code, most courts concentrated solely on the relationship between the debtor and the creditor in determining whether the defendant had satisfied its burden of proof under *both* subparagraphs (B) and (C) [of § 547(c)(2)]. Only in the absence of a history between the parties did these courts look

14

to transactions involving third parties." 5 <u>Collier</u> ¶ 547.04[2][a][i] at 547-56.

Then, in the late 1980s to 1990s, developing precedent required "an independent inquiry into whether the payment practice at issue comport[ed] with industry standards." 5 <u>Collier</u> ¶ 547.04[2][a][i] at 547-56. The United States Court of Appeals for the Fourth Circuit in <u>Advo-System, Inc. v. Maxway Corp.</u>, 37 F.3d 1044, 1048 (4th Cir. 1994), "refuse[d] to say that Congress wrote a separate subsection for no reason at all," and observed that subsection (C) must be analyzed objectively because "the use of subsection B's subjective approach under subsection C would render subsection C superfluous."

Courts endeavored to construe the second and third subsections in a way that minimized overlap between them. The "march of the circuits to the holding that [former] subparagraph (C) requires an independent analysis of the standard of the industry was based partially upon a principle of statutory construction that '[a]n interpretation of § 547(c)(2)(C) which focuses exclusively on the relationship between the creditor and the debtor, would deprive subsection (c)(2)(C) of any independent meaning because (c)(2)(B) already requires that the payment be evaluated in the context of the ongoing relationship between the debtor and the creditor.'" 5 <u>Collier</u> ¶ 547.04[2][a] at 547-56-7 (quoting <u>Miller v. Florida Mining & Materials (In re A.W. & Assocs., Inc.)</u>, 136 F.3d 1439, 1442 (11th Cir. 1998)).

15

The result of all this was that subsection (C) was perceived as somewhat less important because it focused on objective, larger-scale industry standards instead of the more immediate facts of the parties' relationship, which were reserved for discussion under the umbrella of subsection (B).  The required division of focus regarding the two prongs thus shaped the courts' development of the standard to be proved under each as well as the comparative weight to be given to each in differing cases.  See, e.g., In re Molded Acoustical Prods., Inc., 18 F.3d 217, 224 (3d Cir. 1994) (significance of industry standards depends in part on length and nature of relationship between debtor and creditor).

In the Fourth Circuit, the "ordinary business terms" prong has long been considered subsidiary to the "ordinary course of business" prong.  In the leading Fourth Circuit case, Advo-System, Inc. v. Maxway Corp., 37 F.3d 1044, 1049-50 (4th Cir. 1994), the court concluded that the weight to be given to subsection (C) depended in large part on the length of the parties' relationship.  The court adopted a "sliding scale" approach developed by the Third Circuit Court of Appeals in In re Molded Acoustical Prods., Inc., 18 F.3d 217, 226 (3rd Cir. 1994), which in turn was derived in part from a decision of the Seventh Circuit in In re Tolona Pizza Products, Corp., 3 F.3d 1029 (7th Cir. 1993).

16

As the court explained in Advo-System: "At bottom, '[t]he most important thing [as far as the preference statute is concerned] is not that the dealings between the debtor and the allegedly favored creditor conform to some industry norm but that they conform to the norm established by the debtor and the creditor in the period before, preferably well before, the preference period.'" Advo-System, 37 F.3d at 1049 (quoting Tolona Pizza, 3 F.3d at 1032). Only in the absence of an established history between the creditor and debtor did the industry norm become "crucial," because only then was there "no baseline against which to compare the pre-petition transfers at issue to confirm the parties would have reached the same terms absent the looming bankruptcy." Advo-System, 37 F.3d at 1049-50 (quoting Molded Acoustical, 18 F.3d at 226). Where the prior history existed, the industry norm was relevant but "less significant." Advo-System, 37 F.3d at 1050.

The yolk between the "ordinary course of business" defense and the "ordinary business terms" components of § 547(c)(2) has been removed by BAPCPA, and "ordinary business terms" has been released from the controlling influence of the ordinary course of business subsection. The "ordinary business terms" defense is now the equal of the "ordinary course of business" defense, and that change affects pre-BAPCPA case law construing the meaning of "ordinary business terms." See 5 Collier ¶ 547.04[2][a] at 547-58 (Cases "decided under former section

17

547(c)(2)(C) . . . will be less instructive under the revisions [because] many courts subordinated the importance of "ordinary business terms" in those cases where the parties had an extensive history."); see also, e.g., Advo-System, 37 F.3d at 1051-52.

Most courts agreed that an "ordinary business terms" analysis under pre-BAPCPA § 547(c)(2) required an objective application of industry standards.  The objective analysis served two important functions, according to the Court of Appeals for the Fourth Circuit: "'One is evidentiary.  If the debtor and creditor dealt on terms that the creditor testifies were normal for them but that are wholly unknown in the industry, this casts some doubt on his (self-serving) testimony . . . .  The second possible function of the subsection is to allay the concerns of creditors that one or more of their number may have worked out a special deal with the debtor, before the preference period, designed to put that creditor ahead of the others in the event of bankruptcy.'" Advo-System, 37 F.3d at 1048 (quoting Tolona Pizza, 3 F.3d at 1032).

Frequently, both the debtor and the creditor, especially where the creditor was a trade creditor, were involved in the same or related industries.  E.g., Tolona Pizza, 3 F.3d at 1031 (debtor was pizza maker and creditor was sausage supplier); In re Gulf City Seafoods, Inc., 296 F.3d 363, 366 (5th Cir. 2002) (debtor purchased, processed and resold seafood, and creditor supplied the seafood).  In some cases, the

18

debtor and creditor are in entirely different industries, such as in the present case where the creditor is a commercial lender and the debtor was a distributor of natural gas commodities. To identify the relevant standard, the relevant industry or industries must also be determined.

At least one Circuit Court has held that it is the debtor's industry that is the focus of the "ordinary business terms" analysis. See In re Accessair, Inc., 314 B.R. 386, 394 (8th Cir. BAP 2004) ("Section 547(c)(2)(C) requires the transferee to demonstrate that the debtor made the preferential transfer according to the ordinary business terms prevailing within the debtor's industry."), aff'd, 163 Fed. Appx. 445 (8th Cir. 2006). But, the Court of Appeals for the Fourth Circuit has held that the industry standard to be applied when examining "ordinary business terms" is that of the creditor's industry. Advo-System, 37 F.3d at 1048 (courts must "look to the norm in the creditor's industry").

BB&T maintains, consistent with the court's ruling in Advo-System, that the applicable industry standard is that of the banking industry. According to BB&T, it is standard banking practice for a bank to receive payment on a note shortly before the note matures. BB&T argues that both the Line of Credit Note and the Working Capital Note matured on December 23, 2005, and that payments received on December 15, 2005 (Line of Credit Note) and on December 19, 2005 (Working Capital Note)

were according to "ordinary business terms." There are several problems with that argument.

Notwithstanding the holding of the Court of Appeals for the Fourth Circuit in Advo-System, the BAPCPA changes to § 547(c)(2) now require an examination of more than just the standards of the creditor's industry. Many courts have observed many times that the purpose of the ordinary course of business defense is to "leave undisturbed normal financial relations, because it does not detract from the general policy of the section to discourage unusual action by either the debtor or its creditors during the debtor's slide into bankruptcy." E.g., Union Bank. v. Wolas, 502 U.S. 151, 160, 112 S. Ct. 527, 532 (1991)(quoting H.R. Rep. No. 95-595, at 373, U.S. Code Cong. & Admin. News 1978, p. 6329); see also In re Jeffrey Bigelow Design Group, Inc., 956 F.2d 479, 487 (4th Cir. 1992) (same). If the "ordinary business terms" defense only requires examination of the industry standards of the creditor, there would be no review or check on the debtor's conduct.

Now that "ordinary business terms" is a separate defense, the court must consider the industry standards of both the debtor and its creditors. Furthermore, there are general business standards that are common to all business transactions in all industries that must be met. Based on the uncontroverted facts in this case, the transfers to BB&T cannot meet those standards.

BB&T contends that the payment of the two notes was consistent with banking industry standards.  However, the proffered evidence is not sufficient to support that contention.  BB&T's affidavit, which states, for example, that "[w]hen a promissory note becomes due, it is typical and customary at BB&T and in the banking industry for a borrower to pay the note in full on the maturity date or within several weeks before the maturity date," does not establish the industry standard.  Smith Affidavit ¶ 13.  Such a statement is too general to establish industry norms, or to support the "ordinary business terms" defense.  The Court of Appeals for the Fourth Circuit explained in Advo-System, that a creditor may not characterize the industry norm "at too high a level of generality," because generality would render the subsection "virtually meaningless." Advo-System, 37 F.3d at 1051.  BB&T's general statement that a payment meets banking standards is not sufficient.

The industry standards must be applied to the factual circumstances of the transfer.  It may be standard practice for borrowers to pay loans close to the time that the loans mature, but is it standard in the banking industry for a borrower with a multi-million dollar enterprise to pay all of its corporate loans based upon the owner's end-of-the-year personal financial planning, especially where the corporation has not arranged for financing to continue the business?  If that conduct is standard within the banking industry, it

is certainly not ordinary from the debtor's perspective and is not consistent with sound business practice in general.

From BB&T's point of view, it did nothing out of the ordinary. BB&T had no knowledge that NGD was having financial difficulties, did not pursue any collection activity against NGD, and merely received payment on its loans when those loans became due. The court must accept those assertions as true, but that does not entitle BB&T to prevail on its preference defense. The "ordinary business terms" defense also involves consideration of the debtor's industry standards and the standards applicable to business in general. When those standards are examined, the conduct of the debtor in paying its loans was not in accordance with "ordinary business terms." It is clear what was going on here: NGD was going out of business and was paying off those debts which Mr. and Mrs. Lawing guaranteed and for which Mrs. Lawing's assets stood as collateral. These payments were not made "according to ordinary business terms" and are not the type of transfers that the "ordinary business terms" defense is designed to protect. Consequently, BB&T may not prevail on its "ordinary business terms" defense.

The change made by the BAPCPA amendments "substantially lightens the creditor's burden of proof, by allowing the creditor protection from preference recovery if the transfer meets industry standards, regardless of whether it was in the ordinary course of business of the

debtor and the creditor." Richard Levin & Alesia Ranney-Marinelli, <u>The Creeping Repeal of Chapter 11: The Significant Business Provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005</u>, 79 Am. Bankr. L. J. 603, 637 (2005). Although the creditor's burden has been lightened by BAPCPA, it still has some weight, and it has not been lightened to the extent that BB&T can prevail in this proceeding. The trustee is entitled to avoid and to recover from BB&T preferential payments totaling $3,263,516.15 plus interest at the federal judgment rate of 4.67% from the date of demand, February 10, 2006, until paid.[6] Accordingly, the trustee's motion for summary judgment is **GRANTED,** and a separate judgment will be entered.

 **SO ORDERED.**

**END OF DOCUMENT**

---

 [6]<u>See</u> <u>In re Cybermech, Inc.</u>, 13 F.3d 818, 822 (4th Cir. 1994) ("It is well-settled that bankruptcy courts have discretion to award prejudgment interest in § 547 preferential transfer actions, and to compute that interest from the date of demand for the return of the transferred funds."); <u>In re H.P. King Co., Inc.</u>, 64 B.R. 487, 492 (Bankr. E.D.N.C. 1986) (court applies postjudgment rate when determining prejudgment interest in preferential transfer cases).